MINNEAPOLIS FIREFIGHTERS' RELIEF ASSOCIATION, individually and on behalf of all others similarly situated, Union Asset Management Holding AG, Oklahoma Firefighters Pension Fund, Carpenters Annuity Trust Fund for Northern California, and Carpenters Pension Trust Fund for Northern California, Plaintiffs,

v.

MEDTRONIC, INC., William A. Hawkins, III, and Gary Eliss, Defendants.

Civil No. 08–6324 (PAM/AJB).

United States District Court,
D. Minnesota.

Dec. 12, 2011.

Adam Wierzbowski, Gerald H. Silk, Salvatore J. Graziano, Michael D. Blatchley, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, Brian F. Rice, Rice, Michels & Walther LLP, Daniel E. Gustafson, Gustafson Gluek PLLC, Bryan L. Bleichner, Jeffrey D. Bores, Karl L. Cambronne, Chestnut Cambronne, PA, Gregg M. Fishbein, Lockridge Grindal Nauen PLLP, Daniel C. Hedlund, Gustafson Gluek PLLC, Minneapolis, MN, Noam–Na N. Mandel, Robert–Na D. Klausner, Darren–Na J. Check, Jennifer–Na Keeney, Ann–Na K. Ritter, Jay–Na W. Eisenhofer, Geoffrey C. Jarvis, Jeff A. Almeida, Grant & Eisenhofer PA, Wilmington, DE, James M. Hughes, Motley Rice LLC, Mt. Pleasant, SC, Jennifer L. Joost, Sean M. Handler, Alessandra C. Phillips, Kessler Topaz Meltzer & Check LLP, Radnor, PA, Ramzi Abadou, Eli R. Greenstein, Erik D. Peterson, Kessler Topaz Meltzer & Check, LLP, San Francisco, CA, for Plaintiffs.

Amy K. Sterner, Kristin K. Zinsmaster, Peter W. Carter, Dorsey & Whitney LLP, Patrick S. Williams, Briggs & Morgan, PA, Minneapolis, MN, Emily Nicklin, Helen E. Witt, Joshua Z. Rabinovitz, Sallie G. Smylie, Kirkland & Ellis, LLP, Chicago, IL, for Defendants.

## MEMORANDUM AND ORDER

PAUL A. MAGNUSON, District Judge.

This matter is before the Court on Plaintiffs' Motion for Class Certification. For the reasons that follow, the Motion is granted.

## BACKGROUND

Plaintiffs are institutional investors, including several statewide pension funds, all of whom invested in the common stock of Defendant Medtronic, Inc. between November 20, 2006, and November 17, 2008. Plaintiffs claim that Medtronic made false and misleading public statements about one of its medical products, the Infuse bone graft system, and that when those statements were revealed to be false, the value of Medtronic stock plunged.

Infuse is "a surgically-implanted medical device containing a genetically engineered protein designed to stimulate bone growth." (Am. Compl. (Docket No. 68) ¶ 1.) Medtronic received approval from the Food and Drug Administration ("FDA") for certain specific uses of Infuse: "treatment of degenerative discs in the lower lumbar region of the spine, fractures of the tibia, and certain facial/oral surgeries." (*Id.*)

Plaintiffs' claims arise from what they characterize as Medtronic's intentional promotion of off-label uses for Infuse. A physician's use of a device in a manner not specifically approved by the FDA is not illegal. It is illegal, however, for a manufacturer to promote a device's off-label use. Plaintiffs contend that Medtronic engaged in just such promotion, and that eventually more than 85% of Infuse sales involved off-label use. (*Id.* ¶ 3.) At the end of the class period, the Infuse product generated approximately $800 million annually, or 6% of Medtronic's total corporate revenue. (*Id.* ¶ 40.) In the summer of 2008, the FDA issued a warning about a particular off-label use of Infuse and several months later, Medtronic disclosed that it was the target of an investigation by the Department of Justice ("DOJ") regarding off-label use of Infuse. Shortly thereafter, Medtronic's stock fell more than 45% from its class-period high. (*Id.* ¶ 9.)

The Amended Complaint alleges violations of §§ 10(b) and 20, and Rule 10b–5, of the Securities and Exchange Act of 1934, against both Medtronic and three of its officers/former officers. 15 U.S.C. §§ 78j(b) and 78t(a); 17 C.F.R. § 240.10b–5. Specifically, Plaintiffs allege that Medtronic both implicitly and explicitly encouraged its sales force to promote the off-label use of Infuse. Plaintiffs rely on the testimony of 15 confidential witnesses to support this allegation. The testimony of these confidential witnesses provides the basis for Defendants' opposition to the Motion for Class Certification.

According to the Amended Complaint, the information provided by the confidential witnesses either establishes or implies that Medtronic actively promoted off-label uses for Infuse by, among other things, hosting physician meetings at which a Medtronic-paid consulting physician would give a presentation on off-label uses (Am. Compl. ¶ 93), instructing its sales force in the off-label use of Infuse (*id.* ¶ 94), giving physicians literature about off-label uses for Infuse (*id.* ¶ 96) or directing physicians to other surgeons who used Infuse for off-label procedures (*id.* ¶ 102), and advising physicians regarding the appropriate dosage of Infuse for off-label uses (*id.* ¶ 105). Plaintiffs also claim that Medtronic set high sales targets for Infuse and knew or should have known that such high targets could be reached only through illegal promotion of off-label uses of Infuse. (*E.g., id.* ¶ 107.) However, Medtronic did not disclose to investors that sales of Infuse were highly dependent on unregulated, off-label uses of Infuse, or that it was encouraging such uses.

Defendants contend that Plaintiffs misrepresented or actively lied about the testimony of 13 of the confidential witnesses.[1] The Court will discuss Defendants' allegations in detail below.

## DISCUSSION

### A. Standard of Review

A plaintiff seeking to certify a class must initially establish that: (1) the class is so

---

1. Defendants do not challenge the statements in the Amended Complaint attributed to confidential witness 1 or 5.

numerous that joinder of all the members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). If Rule 23(a)'s threshold criteria are met, the plaintiff must then show that the action is maintainable under one of the subsections of Rule 23(b). In this case, Plaintiffs seek certification of a Rule 23(b)(3) class, which requires that: (1) questions of law or fact common to the members of the class predominate over any questions affecting individual members; and (2) a class action is the superior method of adjudicating the controversy.

Plaintiffs seek to represent a class consisting of "all persons or entities who purchased or otherwise acquired Medtronic common stock during the class period, from November 20, 2006 through November 16, 2008, and who were damaged thereby." (Am. Compl. ¶ 26.) Excluded from the class are Defendants and their family members, executive officers and directors of Medtronic, any entity affiliated with Medtronic, and the legal representatives of any member of the excluded groups. (*Id.* ¶ 27.)

In their opposition to the Motion, Defendants do not address any of the substantive requirements of Rule 23, aside from contending that Plaintiffs' counsel is inadequate because of alleged fabrications in the presentation of the facts in the Amended Complaint. Thus, they concede that, if counsel is found adequate, the class is sufficiently numerous, there are questions of fact or law common to the class and those issues predominate over individual issues, the claims or defenses of the named Plaintiffs are typical, those Plaintiffs will fairly and adequately represent the class, and a class action is the superior method of adjudicating the dispute. Defendants also argue that the class definition includes individuals who do not have standing, and that Plaintiffs' loss causation expert is wrong in his calculations and theory.[2]

Although the Court does not consider the merits of Plaintiffs' substantive claims in assessing a motion for class certification, Plaintiffs bear the burden of establishing each prerequisite element to certification. *See Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In rigorously analyzing whether Plaintiffs have met their burden, the Court "may look past the pleadings ... [to] understand the claims, defenses, relevant facts, and applicable substantive law ..." *Thompson v. Am. Tobacco Co., Inc.,* 189 F.R.D. 544, 549 (D.Minn.1999) (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996)); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (noting that analysis of a class certification motion "generally involves considerations that are enmeshed in the factual and legal issues comprising plaintiff's cause of action"). Ultimately, because of the fact-specific quality of the analysis, the Court exercises broad discretion in determining whether or not to certify a particular class under Rule 23. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 345, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Coleman v. Watt,* 40 F.3d 255, 259 (8th Cir.1994).

Plaintiffs have met their burden to establish numerosity, commonality, predominance, typicality, and superiority. Plaintiffs contend that there are more than 1 billion shares of Medtronic common stock outstanding, held by more than 53,000 shareholders. This is unquestionably sufficiently numerous to warrant class certification. Further, the claims present common questions of law and of fact, given that the allegations center on what is alleged to be a common course of conduct to mislead investors. And those common claims undoubtedly predominate over any individual claims. The claims of the named Plaintiffs are typical: named Plaintiffs allege that they and all investors were damaged by the alleged scheme to mislead investors. Finally, the class action device is superior to individual actions especially

---

**2.** Defendants acknowledge that a challenge to an expert is not appropriate at this stage of the litigation. (*See* Defs.' Opp'n Mem. at 34 ("[T]he Supreme Court has held that plaintiffs do not need to prove loss causation in order to have a

class certified.") (citing *Erica P. John Fund v. Halliburton Co.,* —— U.S. ——, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011)).) The Court will therefore not discuss this argument further.

where, as here, many individual claims are likely to be too small to pursue individually.

## B. Adequacy

■ Plaintiffs must demonstrate that they "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To do so, they must show that: (1) their counsel is competent to pursue the action; and (2) their interests are not antagonistic to the interests of the class. *In re Workers' Comp.*, 130 F.R.D. 99, 107 (D.Minn.1990) (Rosenbaum, J.). As noted, Defendants' argument focuses entirely on the supposed inadequacy of Plaintiffs' counsel because of alleged misrepresentations counsel made in the Amended Complaint regarding the testimony of the confidential witnesses.

■ Although "[w]hen class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class," *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir.2011), the inquiry Defendants urge the Court to undertake—whether Plaintiffs misrepresented what the confidential witnesses said—is premature.[3] Discovery is ongoing, and these witnesses have yet to be deposed. The Court cannot decide what the facts are until discovery is complete, including the deposition of the confidential witnesses. Counseldrafted declarations are not a substitute for deposition testimony. In addition, Defendants have not even established that the Amended Complaint in fact contains relevant and substantial misrepresentations.[4] The Court will discuss each witness's statements below.

### 1. Witness 2—Matthew Bine

The Amended Complaint states that this witness recalled that Medtronic would provide physicians who inquired about off-label uses for Infuse with data from published literature and other information about the off-label use of Infuse. (Am. Compl. ¶ 96). In addition, the witness allegedly said that Medtronic told surgeons to use smaller doses of Infuse for the off-label applications, such as in the cervical spine area. (*Id.* ¶ 97.) Finally, the witness discussed Medtronic's sales projections, and, according to the implication of the Complaint, the numbers the senior management team chose for Infuse's sales projections were higher than on-label use of Infuse would support. (*Id.* ¶ 165.)

Bine's declaration does not contradict these statements. Rather, he takes issue with the implications Plaintiffs drew from his statements. He says that Medtronic did not promote off-label use (Williams Aff. Ex. 1 (Bines Decl.) ¶ 8), but admits that Medtronic did provide information to doctors about appropriate doses of Infuse for off-label use. Further, Bine's disagreement with the sales projection paragraph in the Amended Complaint is really a problem with the implication Plaintiffs drew from his statement regarding sales projections. (*See id.* ¶ 14 ("This paragraph *implies* . . . .").) His declaration simply does not support Defendants' allegations of misrepresentations on Plaintiffs' part.

### 2. Witness 3—Chris Powell

The Amended Complaint states that witness 3 was a sales representative in the Mid–Atlantic region from 2005 through 2008. (Am. Compl. ¶ 99.) Powell avers, however, that he only worked for Medtronic from 2004

---

3. This is a very different case than *Creative Montessori*, where the plaintiffs' lawyers "obtain[ed] material from [a business] on the basis of a promise of confidentiality that concealed the purpose of the obtaining the material, a purpose inconsistent with maintaining confidentiality and likely to destroy [the] business; and implying [to one named plaintiff] that there already was a certified class to which the [plaintiff] belonged." *Creative Montessori*, 662 F.3d at 917. As discussed below, most of the alleged misrepresentations about which Defendants here complain are either insubstantial or are not misrepresentations at all.

4. Defendants bring up repeatedly the issue whether each witness asked Plaintiffs to keep his identity confidential. The witnesses are identified as "confidential witnesses" in the Amended Complaint, but the majority of them now say that they did not ask that their identities be kept confidential. Whether the witnesses asked that their identities be secret, however, is a minor issue and one that does not cast doubt on the adequacy of counsel.

to 2005. (Williams Aff. Ex. 2 (Powell Decl.) ¶ 2.) Powell goes on to take issue with the "implication" in the Amended Complaint that the fact that Medtronic took off-label use into account in its sales quotas and growth projections meant that Medtronic encouraged sales representatives to promote off-label use. (*Id.* ¶ 3.) The implication, however, is Plaintiffs' fair interpretation of Powell's statement; there is nothing untrue about how Plaintiffs presented Powell's statements.

The Amended Complaint further quotes Powell as discussing Medtronic's handling of physician inquiries regarding off-label uses. According to the allegations, Powell said that Medtronic would direct the doctor to other surgeons who used the product off-label, and that Medtronic sales representatives would show the doctor how to perform a specific procedure by rolling up the Infuse material "like a burrito." (Am. Compl. ¶ 99.) Again, Powell does not contend that this statement in the Amended Complaint is false, but rather that the Amended Complaint's recitation of his statement is "incomplete." (Powell Decl. ¶ 4.) Finally, the Amended Complaint says that Powell talked about Medtronic sales meetings at which experts would explain how to use Infuse off-label. (Am. Compl. ¶ 99.) Powell says flatly that "[t]his statement is untrue." (Powell Decl. ¶ 5.) But it is not untrue. Powell goes on to say that "Medtronic showed its sales staff how to use Infuse off-label so that they could support the safe use of the product." (*Id.*) This is exactly what the Amended Complaint says. Powell disagrees with the implication, that is, that by showing sales representatives how to use Infuse off-label, Medtronic was either implicitly or explicitly encouraging the off-label use of Infuse. But again, this is Plaintiffs' implication, not Powell's.

Powell's declaration does not support Defendants' argument that Plaintiffs misrepresented his testimony.

### 3. Witness 4—Kirk Riley

Mr. Riley first states that the statements "attributed to me ... are not entirely accurate." (Williams Aff. Ex. 3 (Riley Decl.) ¶ 1.) This is a far cry from Defendants' insistence that Plaintiffs committed fraud on the Court.

The Amended Complaint alleges that Riley said that Medtronic would have a surgeon speak to a group of doctors at Medtronic's national sales meetings about off-label uses of Infuse. (Am. Compl. ¶ 100.) Riley now states that surgeons did not speak to doctors at Medtronic's sales meetings, but rather spoke to Medtronic sales representatives. (Riley Decl. ¶ 4.) He does not, notably, take issue with the idea that surgeons spoke at Medtronic's meetings regarding off-label use of Infuse, but merely that these surgeons did not speak with doctors at those meetings. This is just as likely a typographical error in the Amended Complaint as it is an attempt to mislead the Court.

Similarly, the Amended Complaint states that this witness was aware of complications from a particular off-label use of Infuse—the use in the cervical spine—and that Medtronic told its sales representatives how to advise physicians to deal with such complications. (Am. Compl. ¶ 100.) Again, Riley's declaration provides no basis for proving this statement false. Rather, he says, that Medtronic instructed its sales representatives to refer doctors to the Office of Medical Affairs with questions about dosages in off-label uses, but that if a physician had a question about dosage in the operating room, the sales representative could answer the question "to support patient safety." (Riley Decl. ¶ 5.)

The Amended Complaint also states that this witness "reported that Medtronic sales representatives were instructed to inform surgeons about how other surgeons had used [Infuse] successfully off-label and were commonly in the operating room during surgical procedures involving [Infuse]." (Am. Compl. ¶ 100.) Riley now states that Medtronic did not instruct him to inform surgeons how other surgeons were using Infuse off-label. (Riley Decl. ¶ 6.) He goes on to say, however, that "[i]t is true that I attended surgical procedures involving Infuse in the operating room, and if asked questions by the doctor concerning the procedure, I would answer his question to the best of my ability as part of my role to support patient safety." (*Id.*) Again, this is a far cry from saying that Medtronic never supported off-label use. This is not the blatant mischaracterization Defendants assert.

Finally, the Amended Complaint discussed this witness's comments about Medtronic increasing sales commissions for above-quota sales of Infuse. (Am. Compl. ¶ 100.) The Amended Complaint states that this increase of commissions "provid[ed] an incentive to promote the product for off-label usage." (*Id.*) But the Amended Complaint does not state that Riley believed that Medtronic was providing an incentive to promote off-label use. That implication is Plaintiffs', not Riley's.

Riley's declaration does not support Defendants' opposition to the Motion for Class Certification.

### 4. Witness 6—Mark Marchan

The Amended Complaint states that witness six reported that, if a doctor was interested in using Infuse off-label, Medtronic employees would direct the doctor to other physicians using the product off-label. (Am. Compl. ¶ 102.) Marchan admits, however, that he would direct a physician contemplating off-label use of Infuse to other physicians studying that use. (Williams Aff. Ex. 4 (Marchan Decl.) ¶ 4.) He says that the Amended Complaint's implication that such activity promoted the off-label use of Infuse is incorrect, however. Once again, this is Plaintiffs' implication, not Marchan's.

The Amended Complaint further states that Marchan reported that it was standard practice for a Medtronic sales representative to be in the operating room during procedures involving Infuse "to assist with any issues that might come up with the product." (Am. Compl. ¶ 102.) Again, Marchan disagrees with the implication that this attendance promoted off-label use, but the Amended Complaint does not say that Marchan drew this implication. It merely reports his statement regarding sales representatives attending Infuse procedures. This is not a fraud on the Court.

Finally, the Amended Complaint states that Marchan reported that the Medtronic marketing department advised doctors to use less than the packaged dose of Infuse for off-label uses. (*Id.*) Marchan says that he did not tell Plaintiffs that "Medtronic's marketing department" advised physicians in this way. (Marchan Decl. ¶ 6.) He does not say,

however, that no one at Medtronic advises physicians in this way.

Marchan's declaration does not support Defendants' attack on Plaintiffs' counsel's adequacy.

### 5. Witness 7—Scott Baumer

This witness takes issue with the Amended Complaint's discussion of a booklet allegedly produced by or with the acquiescence of Medtronic, that contained information about the correct dosage of Infuse for off-label uses. (Am. Compl. ¶ 103.) Mr. Baumer now says that the only booklet he had discussed different size body cavities in relation to dosages of Infuse, but did not discuss off-label use. (Williams Aff. Ex. 5 (Baumer Decl.) ¶ 5.)

This is the most serious accusation Defendants make. Plaintiffs contend that they received during discovery the book Baumer (and the next two witnesses, discussed below) described in the Amended Complaint. (*See* Pls.' Reply Mem. at 12.) Defendants argue, in turn, that the book produced supports what the witnesses now state, not what the Amended Complaint alleges. However, whether this book is the described book and whether the witness's statements to Plaintiffs were in fact misrepresented is a matter for a deposition, not for an attorney-drafted declaration.

The Amended Complaint goes on to report this witness as stating that Medtronic employees would respond to a doctor's inquiry about off-label uses with information about other surgeons using the product off-label. (Am. Compl. ¶ 103.) Baumer states that, when faced with such questions about off-label use, his "practice was simply to suggest that the doctor making the inquiry talk directly to the other doctor." (Baumer Decl. ¶ 6.) There is no falsehood in the Amended Complaint's statement.

Finally, the Amended Complaint references this witness's statement regarding Medtronic's decision to market different sizes of Infuse kits. The Amended Complaint states that during Baumer's tenure with Medtronic, the Infuse kits "were too large to fully use in the cervical spine[, an off-label

use,] and that today Medtronic markets smaller sizes of [Infuse] and that doing so does not make sense if the product is intended to be limited to FDA-approved usage." (Am. Compl. ¶ 103.) Baumer denies making any statement regarding the new size of the Infuse kits, which were introduced after Baumer left Medtronic. (Baumer Decl. ¶ 7.) This is one instance where the Amended Complaint comes close to crossing the line in making an implication appear to come from the witness rather than from Plaintiffs. But this is a fine line and, in the Court's opinion, the Amended Complaint does not blatantly misrepresent anything. This statement can be interpreted as Bauer's statement, but can also be interpreted as Plaintiffs' implication. In any case, it does not warrant a finding that Plaintiffs' counsel is inadequate.

### 6. Witness 8—Victor Harmon

The Amended Complaint discusses this witness's recollection of the same book discussed above. (Am. Compl. ¶ 104.) The Court's discussion above will not be repeated here.

The Amended Complaint also states that this witness reported that the vast majority of Infuse procedures during his tenure were off-label procedures. (*Id.*) The witness says that this is "incomplete" because he "also told the plaintiffs' representative that I was unaware of any off-label promotion of Infuse." (Williams Aff. Ex. 6 (Harmon Decl.) ¶ 4.) But again, the Amended Complaint does not misrepresent the witness's statements.

Finally, the Amended Complaint states that Harmon stated that Medtronic instructed its sales representatives on how to "get around" restrictions on off-label promotion. (Am. Compl. ¶ 104.) Harmon denies "getting around" the off-label promotion restrictions or being aware of others who did. Rather, he contends that Medtronic trained him to remind doctors that Infuse was only indicated for FDA-approved uses. (Harmon Decl. ¶ 5.)

As above, this difference in what the Amended Complaint says and what the witness now says is perhaps a misrepresentation, but it could also be that the witness has changed his story. Without the benefit of a deposition, there is no way to know.

The Harmon declaration provides no basis for denying the Motion for Class Certification.

### 7. Witness 9—Sean Hirschkorn

The Amended Complaint discusses this witness's recollection of the same book discussed above. (Am. Compl. ¶ 105.) Again, the Court will not repeat its discussion of this issue.

The Amended Complaint quotes this witness as stating, "You definitely had to tell surgeons who chose to put it in cervical how much to use and [the dosage] was very low." (*Id.*) Mr. Hirschkorn now denies making that statement to Plaintiffs, contending that he "never made such statements to surgeons, and did not tell the plaintiffs' representative that I did." (Williams Aff. Ex. 7 (Hirschkorn Decl.) ¶ 4.) Again, this is a dispute that should be resolved in a deposition or other cross-examined testimony.

The Amended Complaint goes on to say that this witness stated that the vast majority of Infuse procedures were off-label, and that off-label procedures were "far more common" than on-label. (Am. Compl. ¶ 105.) Mr. Hirschkom now says that this statement is "incomplete" because he told Plaintiffs that he did not promote the off-label use of Infuse. (Hirschkom Decl. ¶ 5.) But this portion of the Amended Complaint says nothing about promoting the off-label use of Infuse, so Mr. Hirschkorn's refutation is puzzling.

Finally, the Amended Complaint notes that this witness reported that Medtronic put pressure on sales representatives to reach high sales targets. Mr. Hirschkorn claims that he did not have to promote Infuse because it "sold itself." (*Id.* ¶ 6.) But although the implication of the Amended Complaint's allegation is that there were high sales targets for Infuse (which would, in turn, put pressure on the sales representatives to promote off-label use), Mr. Hirschkorn's declaration simply does not refute the Amended Complaint's statement that there were high sales targets in general.

There is nothing in this Declaration that warrants a finding that Plaintiffs' counsel is inadequate to represent the class.

#### 8. Witness 10—Chris Eddy

The Amended Complaint quotes this witness as saying that Medtronic sales representatives would "get around" the restrictions on off-label promotion by directing inquiring doctors to others who were using Infuse off-label. (Am. Compl. ¶ 106.) Mr. Eddy contends that he told Plaintiffs that, in response to inquiries, he and the sales representatives he supervised would direct physicians to Medtronic's Office of Medical Affairs. (Williams Aff. Ex. 8 (Eddy Decl.) ¶ 4.) As with the statements discussed above, the resolution of the truth of these statements must await deposition or other cross-examined testimony.

The Amended Complaint also attributes to this witness the information that the "vast majority" of Infuse sales were for off-label procedures and that sales representatives knew they could not reach Medtronic's sales targets without those off-label sales. (Am. Compl. ¶ 106.) Mr. Eddy says now that this statement is "incomplete" because he told Plaintiffs that he did not promote Infuse for off-label uses. (Eddy Decl. ¶ 5.) But the statement in the Amended Complaint says nothing about promotion.

Finally, the Amended Complaint discusses a physician with whom Medtronic reportedly had a consulting arrangement, Dr. Todd Lanman. (Am. Compl. ¶ 142.) The Amended Complaint attributes to Mr. Eddy the statement that he knew he could send physicians inquiring about off-label uses to Dr. Lanman. (Id.) Mr. Eddy now says that he did not tell Plaintiffs that he "could send a surgeon to Dr. Lanman because of a study he performed, and I did not send any surgeons to Dr. Lanman." (Eddy Decl. ¶ 6.) Parsing the language as Defendants do, however, the Amended Complaint does not say that Mr. Eddy knew that he could send surgeons to Dr. Lanman because of studies Dr. Lanman performed. Regardless, however, this is a matter for depositions, not declarations.

The Eddy Declaration does not provide a basis for finding Plaintiffs' counsel inadequate.

#### 9. Witness 11—Matt Tosch

Most of this witness's supposed reputations of the attributed statements in the Amended Complaint are reputations of the implications and "innuendo" in the Amended Complaint. (Williams Aff. Ex. 9 (Tosch Decl.) ¶ 5.) The Amended Complaint's implications and innuendo, however, are Plaintiffs', not the witnesses'. That a witness disagrees with the conclusion Plaintiffs drew from what he told them is not evidence that Plaintiffs are misleading the Court.

This witness does take issue with one specific statement attributed to him. The Amended Complaint quotes Mr. Tosch as saying that "the way around" the restrictions on off-label promotion was that Medtronic would bring doctors who were performing off-label procedures to meetings or dinners with other doctors. (Am. Compl. ¶ 107.) Mr. Tosch now says that this "is not true. I did not tell plaintiffs' representative that I was aware of any attempt to skirt the rules regarding off-label promotion . . . ." (Tosch Dec. ¶ 3.) What Mr. Tosch told Plaintiffs is that he had a conversation with his supervisor in which he was told that Medtronic "sometimes brought in doctor-experts to have peer-to-peer conversations with other doctors" but that these conversations were about Infuse generally, not about promoting it for off-label use. (Id.) Whether this is a misrepresentation or a simple mis-reporting, however, is not something that can be resolved through attorney-drafted declarations.

#### 10. Witness 12—Charles Koenig

The Amended Complaint quotes this witness as stating that Infuse was "extensively" dependent on off-label use. (Am. Compl. ¶ 108.) The Amended Complaint goes on to attribute to this witness the statement that it was known within Medtronic that most of Infuse's sales were for off-label uses. (Id.) Mr. Koenig now says that he did not use the word "extensively," although his "impression was that [Infuse] was used in off-label procedures." (Williams Aff. Ex. 10 (Koenig Decl.) ¶ 6.) Moreover, he states that he did not have any first-hand knowledge of what "was known within the company." (Id.)

The Amended Complaint also quotes this witness as stating that Medtronic placed "a lot of pressure on Medtronic Spine to reach a sales target that was unreasonable." (Am. Compl. ¶ 108.) The witness denies characterizing sales targets as unreasonable and says he did not play any role in establishing the targets. (Koenig Dec. ¶ 6.) Notably, though, he does not deny discussing sales targets with Plaintiffs. Finally, he denies saying, as reported in the Amended Complaint, that Medtronic placed "intense pressure" on its sales force to meet sales targets. (Am. Compl. ¶ 166; Koenig Decl. ¶ 8.) But here the Amended Complaint does not purport to quote the witness; rather, the allegation is that four different witnesses described Medtronic's pressure on its sales force. Of course, the implication of this pressure is that such pressure could cause promotion of Infuse for off-label use, but nowhere does the Amended Complaint state that any witness connected the dots in that way.

As with most of the witnesses, what this witness takes issue with are the implications that can be drawn from the way Plaintiffs presented his statements or the information he gave them. But that disagreement does not amount to proof that Plaintiffs misrepresented anything. This declaration, like all the others, does not support denying Plaintiffs' Motion.

### 11. Witness 13—Jake Schwartz

This witness is the most vehement in his refutation of the allegations in the Amended Complaint, stating that the statements attributed to him are "fabrications." (Williams Aff. Ex. 11 (Schwartz Decl.) ¶ 1.) This witness also denies remembering any conversation with Plaintiffs' representatives at all. (*Id.* ¶ 3.)

If this witness's declaration statements are accurate, then the Court agrees that this is something Plaintiffs ultimately must explain. He denies saying anything at all even close to the subjects attributed to him in the Amended Complaint. But, again, this is a matter for deposition testimony, not a reason to find Plaintiffs' counsel inadequate at this stage. Further factual development will sort this question out.

### 12. Witness 14—Derek Crim

The Amended Complaint describes this witness as a senior manager for Medtronic Spinal and Biologics from 2005 to 2008. (Am. Compl. ¶ 166.) In fact, Mr. Crim worked for a company called Kyphon from 2005 to 2007, when Kyphon was acquired by Medtronic. The only statement attributed to him in the Amended Complaint is a statement that Medtronic set sales quotas that were "very, very, very aggressive." (*Id.*) Mr. Crim does not deny making this statement, but contends that Plaintiffs took the statement "out of context." (Williams Aff. Ex. 12 (Crim Decl.) ¶ 7.) But whether the inference Plaintiffs draw from the statement is true is not the same as whether the statement itself was accurate. This witness's declaration does not support the Defendant's opposition to the Motion.

### 13. Witness 15—Richard Treharne

The Amended Complaint identifies this witness as a "Senior Vice President." (Am. Compl. ¶ 170.) In fact, he was a Vice President, not a Senior Vice President. (Williams Aff. Ex. 13 (Treharne Decl.) ¶ 2.) The Amended Complaint goes on to describe meetings between this witness and Medtronic's senior management where adverse events related to Infuse were discussed, meetings "to decide whether or not certain adverse events should be reported to the FDA." (Am. Compl. ¶ 170.) The witness now says that, although he attended meetings at which quality-related issues, including complaints received, were discussed, those meetings did not determine whether to report any adverse events to the FDA. (Treharne Decl. ¶ 6.)

As with the other witnesses, the alleged "misrepresentations" made as to this witness are either very minor or relatively inconsequential. Moreover, whether there were misrepresentations at all remains to be seen, and cannot be determined from the record currently before the Court.

### 14. Conclusion

Defendants' entire opposition to the Motion for Class Certification focuses on these mostly innocuous differences between what the Amended Complaint says and what the

witnesses now say more than three years later. It may be that the depositions of these witnesses will reveal that what Defendants say is true: Plaintiffs' counsel misrepresented what the witnesses told them. But without the benefit of deposition testimony, the Court cannot and will not make that assumption about an officer of the Court.

### C. Class Definition

Defendants' only other challenge to class certification is that the class definition includes some individuals or entities that do not have standing. It is well settled that only someone who has bought or sold a security has standing to raise a 10b claim. The class definition encompasses persons or entities who purchased "or otherwise acquired" shares of Medtronic common stock. (Am. Compl. at 1.) Defendants say that the "otherwise acquired" language renders the class uncertifiable.

■ It is notable that Defendants cite not a single case finding that a potentially overbroad class definition is grounds for not certifying a class. If Defendants believe the class definition should be narrowed, they should have requested that relief in their opposition. Defendants' argument on this point is not well taken.

### D. Lead Plaintiff Certification

Defendants challenge the certification of Teachers Retirement System of Oklahoma ("Oklahoma Teachers") as one of the lead Plaintiffs in this matter because Oklahoma Teachers has been a lead plaintiff in more than five securities fraud class actions.[5] The Private Securities Litigation Reform Act ("PSLRA") provides that an investor may serve as a lead plaintiff "in no more than 5 securities class actions brought as plaintiff class actions ... during any 3–year period." 15 U.S.C. § 78u–4(a)(3)(B)(vi). Defendants contend that Oklahoma Teachers' certification under this section, while "fulfill[ing] the technical requirements of the PSLRA ... sidestepped the question posed by the professional plaintiff rule." (Defs.' Opp'n Mem. at 29.) According to Defendants, Oklahoma

Teachers failed to disclose one case in which it had sought to be a lead plaintiff (and in fact was appointed to be a lead plaintiff), although that case was filed more than three years before the certification and although the case was closed at the time Oklahoma Teachers made its PSLRA certification in this case.

Defendants concede that Oklahoma Teachers complied with the PSLRA. And, as Plaintiffs point out, there is authority for the proposition that the professional plaintiff rule was not intended to apply to institutional investors. *See, e.g., In re Fannie Mae Sec. Litig.,* 355 F.Supp.2d 261, 264 (D.D.C.2005) (quoting legislative history that "[i]nstitutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional plaintiff this legislation seeks to restrict"). Indeed, the legislative history "demonstrates a clear congressional preference for institutional investors to serve as lead plaintiffs." *Id.*

In any case, however, the statute provides that a court may allow a lead plaintiff to serve despite the PSLRA's restrictions. *See* 15 U.S.C. § 78u–4(a)(3)(B)(vi) ("Except as the court may otherwise permit...."). Thus, even if Oklahoma Teachers did not comply with the PSLRA, Defendants' argument and does not provide a reason to deny class certification, nor to deny Oklahoma Teachers's request to be appointed lead plaintiff in this litigation.

### E. Alleged "Grossly Inefficient" Representation

■ Finally, Defendants say that the class should not be certified because Plaintiffs' counsel's representation thus far has been "grossly inefficient." (Defs.' Opp'n Mem. at 31.) This is an interesting accusation, because Defendants are represented by no fewer than three (and previously four) large, national law firms. If, as Defendants contend, Plaintiffs have as many as 11 lawyers on routine conference calls, this is a matter for an opposition to attorney's fees, should

---

5. Defendants say that this "is yet another example of Plaintiffs' lawyers' inadequacy to represent the putative class." (Defs.' Opp'n Mem. at 29.)

They cite no authority for finding inadequate representation from an alleged faulty lead plaintiff certification, however.

Plaintiffs ultimately prevail, not for class certification.

### F. Appointment of Class Counsel

Neither party discusses the appointment of class counsel under Rule 23(g). They apparently believe that the Court's previous appointment of lead counsel under the PSLRA is sufficient for the purposes of Rule 23(g). However, Rule 23(g) provides that "a court that certifies a class *must* appoint class counsel." Fed.R.Civ.P. 23(g)(1) (emphasis added). The Rule sets forth several factors the Court is required to and allowed to consider in making that appointment, factors that are not included in the PSLRA lead-counsel requirements. Thus, the Court is bound to consider the Rule 23(g) factors at this stage.

In appointing lead counsel under the PSLRA, the Court required Plaintiffs' counsel to submit a litigation management plan, to assure that there would be no duplication of effort and assessment of unnecessary fees. (May 26, 2009, Order (Docket No. 57) ¶ 8.) As Defendants point out, however, no such plan has been submitted to the Court to date. Thus, the Court is unable to determine whether the appointment of Plaintiffs' lead counsel to be class counsel is appropriate.

Plaintiffs' counsel are therefore required to file the litigation management plan within 30 days of the date of this Order. The Court also reminds counsel that they are to comply with all requirements set forth in the May 26, 2009, Order, including maintaining detailed time records as more specifically described in that Order.

### CONCLUSION

The opposition Defendants raise to Plaintiffs' Motion is both premature and insufficient. Plaintiffs have established that class certification is appropriate.

Accordingly, **IT IS HEREBY ORDERED that:**

1. Plaintiffs' Motion for Class Certification (Docket No. 224) is **GRANTED;**

2. The Court certifies the following class under Fed.R.Civ.P. 23(b)(3): All persons or entities who purchased or otherwise acquired Medtronic common stock during the class period, from November 20, 2006 through November 16, 2008, and who were damaged thereby.

3. The Court appoints as class representatives Plaintiffs Oklahoma Teachers' Retirement System, Oklahoma Firefighters Pension Fund, Union Asset Management Holding AG, Danske Invest Management A/S, and Westmoreland County Employee Retirement System; and

4. The Court defers ruling on the appointment of class counsel, and further **ORDERS** Plaintiffs' counsel to submit the litigation management plan required by the May 26, 2009, Order within 30 days.